KING *v.* MUNISING PAPER CO.

1. MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—FINDING OF DEPARTMENT CONCLUSIVE IF SUPPORTED BY COMPETENT EVIDENCE.

If an award by the department of labor and industry, under the workmen's compensation act, for the death of

On conclusiveness of findings as to what constitutes an accident or personal injury within the meaning of workmen's compensation acts, see note in L. R. A. 1918F, 877.

an injured employee, is based upon any competent evidence, the law makes it conclusive, even if against the overwhelming weight of competent evidence.

2. SAME—FINDING OF DEPARTMENT THAT INJURY CAUSED CANCEROUS GROWTH SUSTAINED BY EVIDENCE.

In view of undisputed testimony that deceased employee was an apparently strong and healthy man, able to work steadily at hard labor before receiving, in the course of his employment, an accidental injury in the region of the prostate gland, and that after the injury his health steadily declined until his death, but little over a year later, from cancer of the prostate gland, together with medical testimony that the injury was the probable cause of the cancerous growth, it cannot be said, as a matter of law, that there was no evidential support for the conclusion of the department that his death was traceable to the accident.

3. SAME — COMPENSATION — AMOUNT PAID TO INJURED EMPLOYEE CREDITED ON AWARD FOR HIS DEATH.

Where the employer of an injured employee paid him his wages in full after the injury, although much of the time he was able to do little or no work, the award to his dependents of $14 per week for 300 weeks for his death should be credited with $14 per week from the time of the accident to the time of the death of said injured employee.

Certiorari to Department of Labor and Industry. Submitted April 5, 1923. (Docket No. 37.) Decided November 13, 1923.

Elizabeth King presented her claim for compensation against the Munising Paper Company for the accidental death of her husband in defendant's employ. From an order awarding compensation, defendant and the Associated Employers Reciprocal, insurer, bring certiorari. Modified and affirmed.

*Berg, Clancey & Randall*, for appellants.

*R. W. Nebel*, for appellee.

STEERE, J.    Plaintiff's husband, Thomas King, then 54 years of age, died at Munising, Michigan, on March 21, 1922, of a cancer which had developed in his prostate gland.    Imputing the development of the cancer and original cause of his death to an injury he sustained in an accident which befell him on February 4, 1921, while employed by the Munising Paper Company as boom boss in charge of rafting and handling its logs, plaintiff made claim for compensation under the workmen's compensation act.    The claim was contested and hearing had before a commissioner of the department of labor and industry who found that the death of plaintiff's decedent on March 21, 1922, was due to an injury sustained by him in an industrial accident on February 4, 1921, while working for the Munising Paper Company, and awarded to plaintiff $14 per week for 300 weeks and $200 for expenses of his burial.    On defendant's appeal to the full commission the award was affirmed, and defendants have removed the case to this court for review by certiorari, claiming the award is destitute of evidential support.

The main question before us upon this record is whether there is *any* competent evidence to support the commission's finding of facts upon which its award is based which the law makes *conclusive* even against the overwhelming weight of competent evidence, as often pointed out and recently reiterated in *Solomon* v. *Railway*, 221 Mich. 599.

The record contains a report of an accident to deceased on February 4, 1921, on a form approved by the commission, which was sent to the insurance company carrying the employer's risk.    The name of the Munising company is signed to it by H. J. Elliott, claim adjuster, whose testimony that he was authorized to act as attorney in fact for the company in reporting accidents is not denied.    In that report appears:

"26. Cause and manner of accident—Was rolling a heavy log and there was a large knot on one side.   In making an effort to turn the log over he slipped and strained himself.

"27. Nature and extent of injury in detail—Rupture.

"28. Name of attending physician—R. A. Tearman."

On February 9, 1921, deceased was operated on for a hernia by Dr. Tearman.   On recovering from the operation he resumed his work for the Munising company.   He was paid full wages with no lost time from and including February 4th up to December 31, 1921, but did no actual work there after November 8th; nor without intermission before that, his place being at times taken by his son although he remained on the pay-roll.

Defendant's counsel deny the occurrence of any such accident as claimed by plaintiff, showing by their time record and testimony of witnesses that deceased worked full time on that day, and men working with or near him did not see or hear him then have or complain of an accident, saying in their brief:

"Whether or not Thomas King on that day slipped and strained himself, causing a hernia, is not involved in this proceeding in any way, and respondents emphatically deny that Thomas King on that date was struck a blow with a large knot pressed against his peritoneal region.   It is our contention as heretofore stated that the record does not justify the finding of fact by the department of labor and industry to the effect that such accident occurred."

The only witness produced by plaintiff claiming to have personal knowledge of the accident was deceased's son, Russell King, who testified to carrying his father's dinner to him that day and described the accident as follows:

"I was coming from the paper mill.   I had been over getting warm, and I was right close to where this happened and I just looked up in time to see my father down and Gosselin was hollering for somebody, I

didn't know who.    It was a big log and had a knot on about a foot long, anyway a foot long.    And I beat it over there as fast as I could.    My father wasn't exactly pinned under but was under some way.    He couldn't get out.    The knot had him fast some way. I helped Gosselin lift the log.    It seemed his hook that he was using had slipped.

"*Q.* What kind of a hook do they use?

"*A.* Canthook.

"*Q.* Did you notice what part of him the log was up against?

"*A.* Yes, sir.

"*Q.* What part?

"*A.* Right up against his lower regions.

"*Q.* Do you mean by that his crotch?

"*A.* Yes, somewhere in there."

Cross-examination:

"*Q.* Mr. King, as I understood you your father was as it looked to you, pulling on a canthook and the canthook slipped, is that right?

"*A.* That is the way he told it to me.   *   *   *

"*Q.* His hook was in the log and slipped off?

"*A.* Yes, sir.

"*Q.* And let him fall backward?

"*A.* Yes, sir.    He was forced back by the log. When the hook let go the log rolled back.    The other fellow was taking a new hold and he was holding it alone.    His hook slipped and let go or something.

"*Q.* You didn't actually see any log strike your father?

"*A.* No, I didn't."

From the foregoing the commission found there was "little or no doubt that the accident occurred."

There was testimony in the case from which the commission could and did find that prior to the accident deceased was apparently a strong, healthy man, able to work regularly at hard labor without difficulty; that when he returned home on the day of the accident there was a bruise on his body in the vicinity of the prostate gland; that he was suffering much pain and his condition such that he consulted a physician within

two or three days and was operated on for a hernia of recent development, blood thereafter passed with his urine, his health began to fail so that he was unable to work regularly as before and grew worse until, towards the fall of 1921, he found it necessary to obtain medical treatment, for bladder trouble as was at first supposed, and was later found to be suffering from cancer of the prostate gland which ultimately caused his death.     From the history of this case in connection with certain medical testimony, the commission found a causal connection between the accident and his death which it determined resulted from an accidental injury during the course of his employment.

Four physicians were called as witnesses.     Dr. Tearman testified that deceased came to his office two or three days after February 4, 1921, with a bulging on his left side which he said came down when he slipped and strained himself while pulling on a log.     This was found to be a hernia for which his operation was performed.     Before operating the doctor made a physical examination, including "around the peritoneal region on the left of the inguinal canals below the scrotum," discovered no bruises or abrasion over the prostate gland or in that locality and there was no evidence of cancerous growth at that time.     To outward appearance he otherwise was sound and healthy, and returned to work after recovering from the operation, but his health failed and towards fall when called to see him the doctor found him complaining of pain in the small of his back, discomfort in the region of the bladder; losing weight rapidly and "generally going down hill fast," afflicted with carcinoma of the prostate, suppression of the urine and other resulting troubles which terminated in death.     Directly asked, "Did this accident in any way contribute to the carcinoma which caused his death?" he said, "As I stated here previously there is a possibility that that did; that

that might have had some lighting up of an old presence."

Dr. Scholtes testified that several years previous to the accident deceased came to him on two or three occasions for relief from suppression of the urine, requiring use of a catheter which was accomplished with considerable difficulty on account of enlarged prostate gland, removal of which he advised. Although he discovered no sign of carcinoma at that time it was the opinion of the doctor that it had developed in the prostate prior to the time of the accident. In answer to a lengthy hypothetical question based on facts of which there was some testimony, including bruises and other signs of injury in the region of the prostate following the accident, he answered in part:

"I am inclined to believe that he undoubtedly had carcinoma before the injury and that such an injury as you describe would in a measure bring about such conditions that would lead to his death sooner than if he had not been injured.

"*Q.* That is, that it resulted in his death, brought about death, in your opinion, sooner than otherwise?

"*A.* It might do that, yes. Injuries of that kind on carcinomatous growth tissues are more apt to cause death sooner than if that person had not received an injury which was directed in the region of the prostate."

Dr. Lunn of Marquette testified that on September 20, 1921, deceased consulted him for a train of urinary symptoms. On examination he found him suffering from enlarged cancerous prostate gland, the disease being developed to a condition where the case was inoperable from the first time he saw it, and had progressed on subsequent visits of the patient. He so advised him but suggested that he visit the Mayo clinic with the possibility they might make application of radium which would prove beneficial. Deceased did visit the Mayo institution accompanied by his

daughter who was a trained nurse, and they refused to operate except to tap his bladder for temporary relief.    In answer to a hypothetical question based upon testimony in the case he said it was possible but not probable that the cancerous development followed an injury received in the accident as had been testified to.    Of its cause and development he was asked and answered:

"*Q.* A traumatic injury in the region of the prostate would cause a condition like you found?

"*A.* Never heard or read of such an instance.
\*   \*   \*

"*Q.* How long a time would you say that this cancer that you noticed on your examination in Marquette on September 20, 1921, had run?

"*A.* That is hard to estimate.    Probably at least six months.    That would be anywhere from six months to a year or nine months in there.    It might be; a cancer growth of the prostate would average about two years; the ordinary one. \*   \*   \*

"*Q.* You would not say, Doctor, that the condition you found Mr. King in was not the result of injuries?

"*A.* I would say that in my opinion it was not the result of injuries.

"*Q.* It is your opinion that it was not but it might be the result of injuries?

"*A.* It might be, yes, sir."

Dr. Janes, called by plaintiff, who had never seen the deceased but testified as an expert, said he had read the testimony taken at the hearing before the commissioner at Munising on the 13th of September, 1922, that during his practice as a surgeon he many times had cases which involved "similar and like facts that we have here."    The commission was sufficiently impressed by his testimony to state and quote that

"In response to a hypothetical question fairly embracing the facts in the case the doctor answered as follows:

" '*A.* Now in answering this question I will say that these cases must be individualized.    That is the history of the case

has largely to do with the prognosis, that is the outcome. In many cases there is a predisposition to cancer. Apparently this man was in perfect health at the time of his injury. The history of the case shows that six years previously he had an enlarged prostate, what we call hypertrophy and at the time of his injury the prostate gland was normal. It is a well-known fact among surgeons dealing with cancer that any nagging or irritation of tissue devoid of tissue resistance increases the tendency toward malignancy. The time from the injury to his death is the usual history of cancer. I can only say in this case, judging from the history and the predisposition of the prostate gland, that in this particular case, taking into consideration the severity of the peritoneal injury, it was a probable result.. * * *

" 'Q. Would you say, Doctor, that the case of Mr. Thomas King's death resulted from the injuries he sustained on February 4, 1921? That the injuries received on February 4, 1921, were the approximate cause of his death?

" 'A. The history of the case leads me to conclude that it is quite probable.' "

On cross-examination he was asked and answered:

"Q. Doctor, your opinion is based in part upon the assumption that when Dr. Tearman made his examination for the hernia that he found the prostate gland to be normal.

"A. Yes. I say yes, that is part. I base it partly on that; on the history of the case, and of course that is part of it."

Unfortunately for the hypothesis, Dr. Tearman in making his examination for hernia, while finding no "bruise or abrasion over the prostate gland" or in the region of the scrotum, testified:

"I didn't examine the prostate.
"Q. You did not examine the prostate?
"A. No."

He then explained the only method by which its condition could be determined, concluding: "You can't feel it externally."

Plaintiff's case does not, however, rest entirely on the testimony of Dr. Janes. It is undisputed that on

the day alleged deceased suffered an accident of sufficient severity and strain to cause a hernia for which he underwent an operation and before his death another hernia developed which was not operated for. There is testimony that in the accident he was thrown down and held on the ground under a large hemlock log with a protruding knot upon it which struck and pressed him in the crotch or prostate region with such violence as to cause black and blue bruises in that area which owing to the organs located there has, as Dr. Lunn testified, "possibilities of greater delicacy than some other places possibly." He also said the cancerous growth he found deceased afflicted with on September 20, 1921, had run "Probably at least six months. That would be anywhere from six months to a year or nine months, in there." It was testified by the physicians that carcinoma does sometimes result from traumatic injuries, that if such condition existed in the prostate at the time of the accident and an injury was received in the carcinomatic growth it would be apt to cause death sooner than would otherwise result from the regular development of the malignant growth.

Members of his family testified that after the accident deceased was confined to his home and a part of the time to his bed for two or three days, he complained of and manifested pain in the region of the "crotch" over which black and blue bruises appeared, that he passed blood with his urine, and though previously healthy and strong his health steadily thereafter failed until he died. Dr. Tearman's account of his physical condition when he examined him shortly after the accident and as he subsequently observed him confirms their story of his steady decline after the accident.

In view of the undisputed evidence that deceased was an apparently strong and healthy man, able to

work steadily at hard labor before the accident, testimony as to the nature and location of his injuries resulting from it, his condition immediately thereafter and a steady decline until his death but little over a year later, together with other items of the lay and medical history of the case, we are not prepared to hold as a matter of law that there was no evidential support for the conclusion reached by the commission that his death when and as it occurred "was due and traceable to the accident which he suffered on February 4, 1921, while in the employ of the Munising Paper Company."

The commission found that deceased "worked at intermittent periods for respondent employer following his indifferent recovery from the hernia operation until November 8, 1921," and that he "was paid his regular wages," but declined to credit any part of the wages paid him on the maximum award made to plaintiff of $14 per week for 300 weeks.  The record shows it was conceded that following the accident he worked intermittently until November 8, 1921, after which he ceased entirely, but the Munising Paper Company paid him "from February 4, 1921, to June 15, 1921, his regular wages at the rate of $153 per month, and from June 15, 1921, to December 31, 1921, his full wages at the rate of $122.50 per month," and appellants contend that the full amount so paid should be deducted from the award.

It is evident from plaintiff's own evidence as to deceased's condition as well as the conceded facts, that he only worked intermittently up to November 8, 1921, and actually earned as wages but a fraction of the amount he was paid.  The commission found that while employed by the Munising Paper Company deceased suffered a mortal wound in an industrial accident, suffering with which he lingered for over a year thereafter and lingering died.  His employer ac-

knowledged in its written report that he had sustained an industrial accident on the occasion in question resulting in a rupture.    It thereafter paid him while he lived an amount far in excess of the maximum which it was within the power of the commission to impose during that time in any aspect of the case, making due allowance for wages actually earned, medical attendance, etc.    In case of total disability, or death, the maximum compensation provided by the act is $14 per week.    Section 5, part 2, of the workmen's compensation act (2 Comp. Laws 1915, § 5435) provides:

"When weekly payments have been made to an injured employee before his death the compensation to dependents shall begin from the date of the last of such payments, but shall not continue more than three hundred weeks from the date of the injury."

Section 12 of part 2 (§ 5442) provides:

"If the injury so received by such employee was the proximate cause of his death, and such deceased employee leaves dependents, as hereinbefore specified, wholly or partially dependent upon him for support, the death benefit shall be a sum sufficient, when added to the indemnity which shall at the time of death have been paid or become payable under the provisions of this act to such deceased employee, to make the total compensation for the injury and death exclusive of medical, surgical and hospital services and medicines furnished as provided in section four hereof, equal to the full amount which such dependents would have been entitled to receive under the provisions of section five hereof, in case the accident had resulted in immediate death, and such benefits shall be payable in weekly installments in the same manner and subject to the same terms and conditions in all respects as payments made under the provisions of said section five."

While the commission may not penalize the employer for voluntarily paying more during the life of deceased than could legally be imposed, it is a fair pre-

sumption that the discharge of possible legal liability was a consideration and moving factor in making such payments, as well as benevolence or compensation for any labor deceased performed after the accident. The two last mentioned elements are outside the question of legal rights involved here.

The award by the commission of $14 per week for 300 weeks should, we conclude, be credited with $14 per week from the time of the accident to the time of the death of the injured employee. So reduced, it will stand affirmed without costs to either party.

WIEST, C. J., and FELLOWS, MCDONALD, CLARK, BIRD, SHARPE, and MOORE, JJ., concurred.